IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Kalon C. Randolph,            )<br>                                              )<br>                          Plaintiff,  )<br>                                              )<br>    vs.                                     )<br>                                              )<br>Michael J. Astrue,              )<br>Commissioner of Social Security,  )<br>                                              )<br>                          Defendant.  )<br>                                              ) | Civil Action No. 6:10-2212-CMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

       This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

       The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on August 8, 2007, alleging that he became unable to work on August 2, 2001. The applications were denied initially and on reconsideration by the Social Security Administration. On June 16, 2008, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Coretta K. Harrelson, an impartial vocational expert, appeared on September 15, 2009,

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

considered the case *de novo* and, on November 4, 2009, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. At the hearing, the plaintiff amended the alleged disability onset date to September 2, 2006. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on June 30, 2010. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2006.

2. The claimant has not engaged in substantial gainful activity since September 2, 2006, the amended alleged onset date (20 C.F.R. §§ 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe impairments: degenerative disc disease of the lumbar spine, status and post septic left knee, degenerative joint disease of the left knee, and obesity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work, as defined in 20 C.F.R. § 404.1567(b) and 416.967(b), with restrictions that require only occasional balancing, stooping, kneeling, crouching, and crawling; and, avoidance of hazards such as unprotected heights and dangerous machinery.

6. The claimant is capable of performing past relevant work as an airline reservation clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).

> 7. The claimant has not been under a disability, as defined in the Social Security Act, from September 2, 2006, through the date of this decision (20 C.F.R. § 404.1520(f) and 416.920(f).

On July 22, 2011, the plaintiff notified the court that he was recently found disabled as of November 5, 2009, in a subsequent application (Tr. 18). The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually

3

performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his

4

conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff was 41 years old when the ALJ rendered his decision on November 4, 2009 (*see* Tr. 28-29). He graduated high school (Tr. 159) and attended a year of college (Tr. 29).

In September 2006, the plaintiff went to the emergency room following a car accident. He complained of head pressure and pain in his back and neck. He had full range of motion and full muscle strength. A CT scan of his brain was negative, and x-rays of his spine showed no evidence of fractures. He was discharged a few hours later after obtaining complete relief of his pain (Tr. 215, 343-45).

Later in September 2006, the plaintiff saw David Robbins, M.D., for evaluation of his injuries from the car accident. He reported he was employed for a human remains removal service. He complained of moderate pain in his neck that was worse on the right, numbness of his right hand, headaches, low back pain, and intermittent cramps in his left thigh. He denied numbness or tingling in his legs, weakness, shortness of breath, chest pains, or depression. He had full strength and a normal gait. Dr. Robbins recommended physical therapy. He attended a few sessions, but on follow-up in November 2006, Dr. Robbins indicated that the plaintiff "continues to have difficulty coming for therapy on a regular basis due to work conflicts" (Tr. 215-18, 220-21, 349). The plaintiff indicated that his pain had worsened over the previous two weeks (Tr. 220). The plaintiff was instructed to attend physical therapy at least two times per week and to return to the clinic in three weeks (Tr. 220).

The plaintiff saw Dr. Robbins several times in early 2007. In January, the plaintiff reported severe pain for about 11 days. An MRI showed a herniated disc at one

vertebrae level and a mild disc bulge at another vertebrae level with no nerve root impingement. Dr. Robbins again recommended physical therapy. In March, the plaintiff reported pain in his neck, shoulders, back, and legs, with intermittent numbness and tingling. He said sometimes his legs would "give away". He was not taking any medications regularly. He had good strength and reflexes, and a normal gait. Dr. Robbins recommended additional physical therapy. Nerve conduction studies were normal (Tr. 207-213, 254-57). On April 24, 2007, the plaintiff reported that he had quit physical therapy and that he continued to have severe low back pain. Dr. Robbins referred him for pain management and epidural steroid injections (Tr. 214).

In June 2007, the plaintiff saw Edward Frankoski, D.O., for pain management evaluation. The plaintiff described his occupation as a "body remover, pick up dead persons" and indicated he worked 50 hours per week. He reported pain in his upper back, shoulders, upper arms, low back, and legs, and complained of numbness and tingling. Straight leg raising test was positive bilaterally. He had full strength, a normal gait, and intact sensation. His lungs were clear, and he denied ever having COPD. During June and July, Dr. Frankoski administered three steroid injections to the plaintiff's low back. After the first injection, the plaintiff reported improvement in his overall pain. At the second injection appointment, Dr. Frankoski noted the plaintiff had a normal gait (Tr. 244, 245-47, 261-73).

The plaintiff returned to Dr. Robbins for a final neurological evaluation in September 2007. He reported low back pain and sometimes tingling in his shins and feet. The plaintiff said he had lost 70 pounds over the past few months. He had a normal gait, normal reflexes, intact sensation, and full muscle strength. Dr. Robbins diagnosed lumbar myofacitis (pain from inflamed muscles in the low back) and herniated disc at one vertebrae level in his low back. He opined these conditions were caused by the September 2006 car accident. He opined the plaintiff had "reached a point of maximum medical improvement" and retained a "10% permanent/partial impairment to the body as a whole, based on my

opinion and the Guidelines to the Evaluation of Permanent Impairment, 5th Edition, American Medical Association."[2] Dr. Robbins indicated the plaintiff had no motor deficits that had resulted in a sustained disturbance of gait, station, and/or fine or gross movement. He also indicated the plaintiff had full grip strength and no deficits in his extremities or muscle groups (Tr. 270, 276-78, 280).

In October 2007, state agency consultant James Green, M.D., reviewed the records and assessed the plaintiff's physical residual functional capacity ("RFC"). Dr. Green noted the plaintiff's conservative treatment and longitudinal examinations showing normal neurological findings and normal gait. He noted the plaintiff's joints had no inflamation. He indicated that, in an eight-hour workday, the plaintiff could: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours; sit about six hours; and occasionally climb, balance, stoop, kneel, crouch, and crawl. He said the plaintiff should avoid frequent exposure to unprotected heights (Tr. 281-288).

In November 2007, the plaintiff saw Behnam Myers, D.O., for an orthopedic spine consultation. The plaintiff reported that he was unable to work at his job doing post mortem body recovery due to the inability to lift. He had full range of motion and full strength in his arms and legs. Straight leg raise testing was mildly positive bilaterally. Dr. Myers recommended a lumbar discogram (x-rays after injection of contrast medium). He indicated that, if the discogram was positive, he would recommend continued weight loss, and the plaintiff might benefit from a low back fusion. Dr. Myers completed a "Certificate of Return to Work or School" form letter addressed to the plaintiff's employer. Dr. Myers indicated that the plaintiff could work at the sedentary exertional level for eight hours daily,

---

[2] Physicians use the American Medical Association's ("AMA's") guidelines to rate impairments in workers' compensation cases. *See Ward v. Apfel*, 65 F.Supp.2d 1208, 1216 (D. Kan. 1999). The AMA's guidelines distinguish between "impairment" and "disability," making clear that the evaluation of impairment is a medical function, but the determination of disability is an administrative function. *Begley v. Sullivan*, 909 F.2d 1482 (6th Cir. 1990)(unpublished table case). "[T]he AMA impairment ratings are not correlated in any way with the social security disability program." *Id.*

7

but he also indicated that the plaintiff was limited to two hours of sitting and two hours of standing. He said the plaintiff could lift and carry up to five pounds. He restricted the plaintiff from climbing, bending, crawling, stooping, "driving/heavy machinery," and contact sports. He indicated that the plaintiff could swim (Tr. 291-93).

In April 2008, state agency physician William Cherry, M.D., reviewed the records and assessed the plaintiff's physical RFC. Dr. Cherry noted the plaintiff had a normal gait, normal strength, no inflamation, no atrophy or deformity, intact sensation, and full range of motion in his joints (other than his spine). He indicated that, in an eight-hour workday, the plaintiff could: lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk about six hours; and sit about six hours (Tr. 294-301).

In April 2008, the plaintiff saw consultative examiner John Oshodi, Ph.D., for a psychological disability evaluation. The plaintiff reported that he had "experience in the mortuary business where he worked as a pre-need counselor." He reported back pain, migraine headaches, and neck strain. His affect was sad and worried as he spoke of his medical conditions. His speech and thought process were clear, coherent, logical, and goal-oriented. He had "slightly fair" concentration and attention and fair memory, judgment, and insight. Dr. Oshodi diagnosed mood disorder due to medical conditions, with depressive features. He indicated the plaintiff had no impairments in the ability to concentrate on day-to-day tasks. However, Dr. Oshodi indicated that the plaintiff's "ability to perform tasks that call for competitive skills or sustained persistence presented as limited due to his observed poor frustration tolerance and intense approach to the testing environment." He also stated that the plaintiff's social interaction skills showed worry and intensity at that time. He said the plaintiff's ability to perform daily activities was fair, and his "ability to perform work activities and fully function under pressure could be limited by his intense concern over his physical condition and reported general fatigue" (Tr. 303-306).

In April 2008, the plaintiff went to the emergency room for back spasms. The emergency room physician prescribed painkillers and advised "no heavy lifting" (Tr. 308-17).

In May 2008, state agency physician Lee Coleman, Ph.D., reviewed the records and completed a "Psychiatric Review Technique" form. Dr. Coleman noted the plaintiff's unremarkable mental status examination and lack of treatment for any psychiatric symptoms. Dr. Coleman indicated the plaintiff had no limitations in activities in daily living or social functioning; mild limitations in concentration, persistence, or pace; and no episodes of decompensation. He concluded that the plaintiff had no severe mental impairments (Tr. 318-31).

Also in May 2008, the plaintiff began receiving primary healthcare treatment at Black River Healthcare. He complained of leg and back pain, and his back had decreased range of motion. His physician prescribed Lortab (a painkiller). On follow-up a month later, the plaintiff reported that Lortab did not relieve his pain as well as Aleve. Two months thereafter, the plaintiff reported that Aleve continued to be more effective than Lortab. In October 2008, the plaintiff complained that he had pain and swelling in his right arm and elbow for a week. His physician treated him for gout. In February 2009, the plaintiff complained of right-sided pain from his neck to his toes for three days, with numbness and tingling. His physician diagnosed a cervical strain and prescribed painkillers. In May 2009, the plaintiff complained of pain in his low back and legs for three days, as well as swelling in his right foot. His physician treated him for gout and degenerative disc disease (Tr. 356-61).

In July 2009, the plaintiff's physician advised him that he "must" increase his cardiovascular exercise. Later in July 2009, the plaintiff presented to the emergency room complaining of progressive pain and swelling in his left knee for three days. The plaintiff was admitted to the hospital on July 9, 2009. A pelvis x-ray was normal and showed hip

9

joint spaces were symmetric and maintained, and range of motion was well preserved in his left hip and ankle (Tr. 355, 375, 379, 387). Left knee x-rays showed severe degenerative joint disease, but no fractures (Tr. 377, 405-07). Jeffery Holman, M.D., determined the plaintiff's symptoms were consistent with septic arthritis (inflammation of a joint due to a bacterial infection), and he recommended arthroscopic lavage (washing out any blood, fluid, or loose debris from inside a joint space using an arthroscope, a minimally invasive surgical procedure used to evaluate and treat orthopedic conditions). The procedure was performed on July 10, 2009. During the arthroscopy, Dr. Holman drained a significant amount of pus, cleaned for infection, and removed inflamed joint tissue and damaged tissue. The day after surgery, the plaintiff had full strength in his arms and legs, and a physical therapist assessed his rehabilitation potential as "good" (Tr. 374, 375, 376, 378, 391, 403-404, 408-410). He reported he still had left knee pain and some pain in his feet that he said felt like a flare of his gout. The plaintiff stated that Aleve and steroids best treated such gouty flares. Subsequently, Dr. Holman and attending physicians indicated the plaintiff improved progressively each day. On discharge a few days after the surgery (July 15, 2009), the attending physician advised the plaintiff he could ambulate with crutches (Tr. 332-34, 385-86, 397, 399, 401).

The day after the plaintiff was discharged from the hospital in July 2009, he slipped and fell in Wal-Mart. He saw Dr. Holman for follow-up and reported pain and difficulty with mobilization. Dr. Holman injected cortisone into the plaintiff's left knee. At followup visits in late July and mid-September, Dr. Holman indicated that the plaintiff had done "reasonably well." He indicated the plaintiff would require a knee replacement once he was infection free and recommended the plaintiff wait a full year from the arthroscopy. Dr. Holman stated, "I think the surgery realistically is going to be mandatory if [he] has any hopes of resuming any kind of active lifestyle and/or gainful employment." Dr. Holman noted the plaintiff had "maintained most of his pain with Aleve" (Tr. 381-83). Dr. Holman

also completed an undated form titled "Doctor's Statement." Dr. Holman indicated that the plaintiff was "temporarily disabled" and unable to work at any occupation for more than nine months. He checked a box indicating the plaintiff had a "Class 5 - Severe limitation of functional capacity; incapable of minimum (sedentary) activity. (75-100%)," and he estimated that the plaintiff would be able to return to work on about January 1, 2011. He indicated that his care for the plaintiff would be visits every three months for follow-up (Tr. 373).

At the September 2009 administrative hearing, the plaintiff testified he had last worked as a travel reservations agent for about two years. Prior to that, he had worked at a temporary agency, a food bank, the Salvation Army as a cook, and at other jobs cleaning, performing maintenance, and cutting fish. He said he last worked in September 2001. He testified he did nothing and lived at home between 2001 and 2006 (Tr. 32-33, 34-37); he said he had been "just trying to take it easy" (Tr. 41; *see also* Tr. 50 (The plaintiff later stated that he was not able to work because his body would not let him)). The plaintiff testified that, in late 2005, he took a few online courses about the hazards of dealing with corpses and applied for a license to remove deceased human remains. He said he did not do the actual work; he just obtained the license in his name. The plaintiff testified that recent treating source records that indicated that he was working were mistaken (Tr. 29-31).

The plaintiff testified his health conditions included: arthritis in his hands, degenerative joint disease in all joints, chronic obstructive pulmonary disease ("COPD"), shortness of breath, obesity, and problems with his back and left leg after a September 2006 car accident. He said he used a cane daily (which he said his physician prescribed in November 2006), and he sometimes used crutches (Tr. 38, 46, 48, 50-53). He said his legs would go numb, he could just fall down at any time, and sometimes his back would swell so badly that he had to stay still (Tr. 39, 48). He said he went to the emergency room on 40 to 50 occasions prior to the motor vehicle accident and 10 to 15 times subsequent

11

to the accident (Tr. 55-56). Prior left knee surgery in July 2009, the plaintiff had used Aleve for his pain (Tr. 46). He testified both of his knees needed replacement (Tr. 40). The plaintiff testified that he sometimes drove to places he needed to go, such as the store or church (Tr. 41).

## **ANALYSIS**

The plaintiff alleges disability commencing September 2, 2006 (Tr. 11). As noted above, the plaintiff was recently found disabled as of November 5, 2009, the day after the ALJ's decision in this case (doc. 18). The ALJ found that the plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine, status post septic knee, degenerative joint disease of the left knee, and obesity (Tr. 13). The ALJ further found that the plaintiff could perform light work with restrictions that require only occasional balancing, stooping, kneeling, crouching, and crawling, and avoidance of hazards such as unprotected height and dangerous machinery. He determined the plaintiff could perform his past relevant work as an airline reservation clerk. The plaintiff argues that the ALJ erred by (1) failing to properly evaluate the opinion of his treating physicians; (2) failing to properly evaluate his credibility; and (3) failing to properly explain the RFC findings.

### *Treating Physicians*

The plaintiff first argues that the ALJ failed to properly consider the opinions of Drs. Holman and Myers. The regulations require that all medical opinions in a case be considered, 20 C.F.R. § 416.927(b), and, unless a treating source's opinion is given controlling weight, weighed according to the following non-exclusive list: (1) the length of the treatment relationship and the frequency of the examinations; (2) the nature and extent of the treatment relationship; (3) the evidence with which the physician supports his opinion; (4) the consistency of the opinion; and (5) whether the physician is a specialist in the area in which he is rendering an opinion. 20 C.F.R. § 416.927(d)(2)-(5). *See also Johnson v. Barnhart*, 434 F.3d 650, 654 (4th Cir. 2005). However, statements that a patient

12

is "disabled," "unable to work," meets the listing requirements, or similar assertions are not medical opinions. These are administrative findings reserved for the Commissioner's determination. SSR 96-5p, 1996 WL 374183, at *5.

The opinion of a treating physician is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case. *See* 20 C.F.R. § 416.927(d)(2); *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). Social Security Ruling 96-2p requires that an ALJ give specific reasons for the weight given to a treating physician's medical opinion. 1996 WL 374188, at *5. As stated in Ruling 96-2p:

> [A] finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in [20 C.F.R. § 416.927]. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

*Id.* at *4.

As noted above, Dr. Holman, an orthopedic specialist who performed the arthroscopy of the plaintiff's knee in July 2009, opined that the plaintiff had severe limitation of functional capacity and was incapable of even sedentary activity, and he estimated that the plaintiff would be unable to work for longer than nine months (Tr. 373). He further indicated that the plaintiff would require knee replacement surgery in order to resume an "active lifestyle and/or gainful employment" (Tr. 381), but that the plaintiff should wait a full year from the time of his arthroscopic procedure before proceeding with a knee replacement (Tr. 382).

The ALJ acknowledged Dr. Holman's opinion (Tr. 18), but did not state what, if any, weight was given to the opinion or the reasons therefore. The Commissioner argues

13

that the ALJ's decision, when read in its entirety, demonstrates that the ALJ analyzed all of the relevant evidence and sufficiently explained his rationale. This court disagrees. Given the ALJ's failure to evaluate this opinion, there is simply no basis for the court to make a determination as to whether the ALJ's presumed decision to grant the opinion little or no weight is based upon substantial evidence. Upon remand, the ALJ should be instructed to evaluate the opinion in accordance with the foregoing.

The plaintiff further argues that the ALJ failed to properly consider the assessment of Dr. Myers. In November 2007, the plaintiff saw Dr. Myers for an orthopedic spine consultation. Dr. Myers indicated that the plaintiff could work at the sedentary exertional level for eight hours daily, but he also indicated that the plaintiff was limited to two hours of sitting and two hours of standing. He said the plaintiff could lift and carry up to five pounds. He restricted the plaintiff from climbing, bending, crawling, stooping, "driving/heavy machinery," and contact sports (Tr. 291-93).

The ALJ considered Dr. Myers' opinion but dismissed it by stating, "Apparently, these restrictions were based on the claimant's subjective complaints as they are not supported by Dr. Myers' clinical findings" (Tr. 18). However, as argued by the plaintiff, Dr. Myers specifically noted that he reviewed the plaintiff's lumbar MRI, which demonstrated a desiccated disk with herniation and foraminal nerve root narrowing, and he also indicated the plaintiff had a mildly positive straight leg raise test (Tr. 292). This court finds that the ALJ's one-sentence rejection of Dr. Myers' opinion is insufficient given that Dr. Myers summarized clinical findings that did in fact support his opinion. Upon remand, the ALJ should be instructed evaluate the opinion in accordance with the foregoing.

***Credibility and Residual Functional Capacity***

The plaintiff further argues that the ALJ failed to properly evaluate his credibility and also failed to adequately explain his RFC findings. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 594-95 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Moreover, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

(1) the individual's daily activities;

>(2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;
>
>(3) factors that precipitate and aggravate the symptoms;
>
>(4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;
>
>(5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;
>
>(6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
>
>(7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms

*Id.* at *3.

>Social Security Ruling 96-8p, 1996 WL 374184, provides:
>
>The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

The ALJ found that while the plaintiff's impairments could reasonably be expected to cause the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects of the symptoms were not credible to the extent alleged (Tr.

16

19-21). Specifically, the ALJ highlighted the plaintiff's daily activities, the fact that he took only over-the-counter pain medication, and inconsistent statements regarding his work activity (Tr. 19).

The ALJ found the plaintiff had the RFC to perform light work, with restrictions that require only occasional balancing, stooping, kneeling, crouching, and crawling, and avoidance of hazards such as unprotected heights and dangerous machinery. Light work requires standing and/or walking about six hours of an eight hour workday. 20 C.F.R. ¶¶ 404.1567(b), 416.967(b).

The plaintiff testified in the hearing that he has used a cane daily since November 2006 (Tr. 46). The ALJ acknowledged this testimony in his decision (Tr. 19), but did not specifically state why this allegation was rejected as not credible. The plaintiff's treating physician has stated that the plaintiff had severe limitation of functional capacity, was incapable of even sedentary activity, and would require knee replacement surgery in order to resume an "active lifestyle and/or gainful employment" (Tr. 373, 381). As discussed above, this court recommends that the Commissioner's decision be remanded for consideration of Dr. Holman's opinion. In light of this, this court further recommends that upon remand the ALJ be further instructed to consider the plaintiff's testimony that he needed a cane to ambulate along with the objective evidence of the "severe deformity" (Tr. 374) of the plaintiff's knee in reconsidering the RFC assessment.

## **CONCLUSION AND RECOMMENDATION**

Based upon the foregoing, this court recommends that the Commissioner's decision be reversed under sentence four of 42 U.S.C. § 405(g), with a remand of the cause to the Commissioner for further proceedings as discussed above.

s/ Kevin F. McDonald
United States Magistrate Judge

December 6, 2011
Greenville, South Carolina